UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

HONGXIA WANG,

                                     Plaintiff,

                    -against-

DEREK ENLANDER,

                                     Defendant.

———————————————————

Civil Action No.: _____

**JURY TRIAL DEMANDED**

<u>**COMPLAINT**</u>

Plaintiff Hongxia "Wendy" Wang, by and through her attorneys, the Asian American

Legal Defense and Education Fund and Haynes & Boone LLP, for her complaint against

defendant Derek Enlander alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.       This is an action brought by Plaintiff Hongxia "Wendy" Wang ("Ms. Wang") for

damages she suffered at the hands of her employers, defendant Derek Enlander and his wife,

non-party, Caron Enlander (together, with Derek, the "Enlanders").  In flagrant violation of

federal and state laws, the Enlanders, through a calculated scheme of manipulation, fraud, and

physical violence, trafficked Ms. Wang into their home to work as their slave.  From 1999

through 2011, the Enlanders entrapped Ms. Wang, subjecting her to ridicule and insults; threats

of deportation, physical harm, and death; and routine sexual assault.  Ms. Wang was deprived not

only of wages, but of basic human dignity.  She was starved, forced to sleep on the floor or a

couch, and restricted from going to the bathroom to relieve herself.  Through a combination of

intentional manipulation and coercion, the Enlanders tricked Ms. Wang into working for them

for numerous years without pay.

2.     Ms. Wang now brings this action pursuant to the Thirteenth Amendment to the United States Constitution and its enforcing statute, the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1584, 1589, 1590 and 1595; and for common law fraud, conspiracy to commit fraud, breach of contract, quantum meruit, and unjust enrichment.

## THE PARTIES

3.     Plaintiff Hongxia "Wendy" Wang is a resident of the state of New York.  At all times relevant to this action, Ms. Wang resided both in Queens, New York and at the home of the Enlanders in New York, New York.

4.     Defendant Derek Enlander is a resident of the state of New York.  He resides in New York, New York.  At all times relevant to this action, Derek was a practicing physician at Mount Sinai Hospital and at his own private clinic, New York ME/CFS Center.  Derek was married to non-party Caron Enlander, who passed away in or around May 2006.  Caron owned a jewelry business in New York City's Diamond District called Caron Joailliere.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction pursuant over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue properly lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the defendant resides in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

## FACTS RELEVANT TO THE CLAIM FOR RELIEF

### Ms. Wang Seeks New Opportunities in the United States

7.     Before Ms. Wang immigrated to the United States, she lived a quiet and happy life in Tianjin, China with her husband and daughter.  Both she and her husband were college-

educated.  Her husband had a steady job working with computers, and the demand for his work

was growing.  They raised their daughter in a wholesome and loving environment.  As with

many Chinese families, particularly under the one-child-per-family law, the focal point of their

lives was their child, and her success and happiness.

8.      Ms. Wang and her husband enrolled their daughter in an international school,

where their daughter excelled in academics and athletics, and learned to speak English.  Ms.

Wang's daughter's accomplishments were recognized by the other parents, and the school even

invited Ms. Wang to give presentations on effective parenting.

9.      Ms. Wang was incredibly proud of her daughter and wanted to secure the best

possible future for her.  In order to do this, Ms. Wang immigrated to the United States in

February 1997, hopeful that she would soon find a way to bring her daughter here as well.  While

the move was difficult, she knew it was the only way to secure better opportunities for her

daughter.

***The Enlanders Recruit and Obtain the Labor and Services of Ms. Wang***

10.      Although Ms. Wang initially arrived in Calabasas, California in February 1997,

she moved to New York, New York in or around May 1997 in search of better job opportunities.

11.      By January 1999, Ms. Wang had found steady work, making $45.00 a day, at a

nail and hair salon owned by a man named Rafael ("Rafael's Salon").  Rafael's Salon served

wealthy Upper East Side Manhattanites, to whom Ms. Wang gave manicures, pedicures, and

massages.

12.      Caron was a frequent customer at Rafael's Salon.  A woman named Lolita who

worked at Rafael's Salon attended to Caron's perfectly coiffed hair.  Caron had a very

commanding presence, and Lolita instructed the other employees of Rafael's Salon not to stare at

Caron or speak to her unless spoken to first.  Indeed, Caron was dressed to the nines in sophisticated and luxurious-looking clothing and accessories, and she carried herself with confidence and purpose.

13.     Ms. Wang gave Caron manicures, pedicures, and massages.  Heeding the instructions of Lolita, Ms. Wang tried not to stare at Caron, and did not speak to Caron unless first spoken to.

14.     Based on information and belief, Ms. Wang was the only Asian employee of Rafael's Salon.  Ms. Wang was also the only recent immigrant working at the salon, and her English speaking and comprehension skills at the time were limited.

15.     Caron singled Ms. Wang out when she came into Rafael's Salon, demanding that "the Chinese girl . . . give [her] a massage."  Caron would also call a man named Peter, who was the manager at Rafael's Salon, about once a week during the lunch hour to ask him to send Ms. Wang to help her with deliveries for her jewelry business, Caron Joailliere.  Ms. Wang made these deliveries with the understanding that she was doing so as a courtesy, because Caron was a patron of Rafael's Salon.

16.     Eventually, however, in or around March 1999, Caron officially recruited Ms. Wang to work for her jewelry business, Caron Joailliere, in the Diamond District.  Ms. Wang was promised $8.00 per hour to work as Caron's assistant on her day off from Rafael's Salon.  Ms. Wang accepted the offer, because it would enable her to earn more money.  She assisted Caron with all aspects of her business, including, but not limited to, helping Caron source stones and other materials for her jewelry designs from other vendors in the Diamond District, making deliveries around town to customers and other vendors, picking up Caron's lunch and coffee, distributing advertisements, polishing jewelry, and giving Caron massages at her desk.

17.    On or around April 1999, after Ms. Wang had served diligently as Caron's assistant at the jewelry store, Caron recruited Ms. Wang to work at the Enlanders' home to provide various types of private spa treatments for Caron and her husband Derek on a daily basis. The Enlanders agreed to pay Ms. Wang $80.00 per hour for these services.

18.    After Ms. Wang's shift at Rafael's Salon ended around 5 or 6 p.m., she would go home to eat a quick dinner, and then rush to the Enlanders' Fifth Avenue home around 7 or 8 p.m. to provide them with a variety of spa treatments and services, including, but not limited to facials, pedicures, manicures, foot washing, eyebrow waxing, and massages. On at least one occasion, Derek complained about the fact that Ms. Wang needed to go home to eat dinner, stating that he preferred for her to go straight to the Enlanders' home instead. Ms. Wang would then work for the Enlanders until around 1 or 2 a.m. Sometimes Caron's mother visited, and Ms. Wang would give her massages as well.

19.    Over the course of the spring through fall of 1999, the Enlanders' demands grew and began consuming all of Ms. Wang's time outside of her job at Rafael's Salon. Ms. Wang performed spa treatments for Caron and Derek every weekday evening and was always on call during the weekends. Caron would repeatedly call Rafael's Salon and demand that Ms. Wang quit Rafael's Salon. Caron often left messages with Ms. Wang's manager to "tell [Ms. Wang] to come to my house" after work.

20.    Caron also disrupted Ms. Wang's workday by calling Rafael's Salon and demanding that Ms. Wang run errands for Caron Joailliere during her lunch break.

21.    The Enlanders also pressured Ms. Wang to take days off from Rafael's Salon to attend to their needs. During the summer of 1999, the Enlanders coaxed Ms. Wang into taking time off from Rafael's Salon to go to their Hamptons home to be a full-time live-in masseuse.

Ms. Wang sat behind the driver's seat and had to massage Derek's shoulders as he drove to and from the Hamptons.  While in the Hamptons, Ms. Wang was asked to provide approximately seven to eight hours per day of massages and other spa services to each of Caron and Derek.

22.     The Enlanders otherwise kept Ms. Wang isolated in their Hamptons home while they went out to socialize with friends, and they forced Ms. Wang to sleep on the floor of an office that Derek kept on the first floor of the house.  Indeed, the Enlanders had at least one bedroom on the second floor of the Hamptons house that was often unoccupied.  Derek, however, forbade Ms. Wang from sleeping in the empty room, judging that Ms. Wang would be fine sleeping on the floor.

23.     The Enlanders had successfully isolated Ms. Wang and monopolized all of her time by Thanksgiving of 1999, when the manager at Rafael's Salon called Ms. Wang to let her go and Ms. Wang began working full-time for the Enlanders.

***The Enlanders Manipulate, Defraud, and Coerce Ms. Wang into Indentured Servitude: 1999 - 2003***

24.     By December 1999, Ms. Wang had worked over 1,500 hours at Caron Joailliere and the Enlanders' home.   For all this work, she received only $80.00 from the Enlanders.  Moreover, the Enlanders refused to reimburse Ms. Wang for out-of-pocket expenses she incurred while working for them.  Ms. Wang was frequently told to use her own money when purchasing lunches and coffee for Caron.  She was also required to take taxicabs when making deliveries to Caron's jewelry customers because, accordingly to Caron, taking the subway was uncouth and dangerous.  On at least one occasion, Ms. Wang was also asked to pay the Enlanders' $140.00 ConEdison bill and $75.00 cell phone bill with her own money.

25.     When Ms. Wang asked to be paid, the Enlanders would give her a litany of excuses.   Caron explained that her business was slow but promised to pay Ms. Wang by the end

of December 1999 because she expected increased profits over the holidays.  Caron and Derek also played good cop, bad cop.  Caron insisted that the Enlanders never had enough cash at any moment, and that she would have to seek permission from Derek, as head of household, to write a check to Ms. Wang.  Caron would then enter Derek's office, close the door, and pretend to hold a conversation with him about paying Ms. Wang.

26.     Ms. Wang had no reason to believe that the Enlanders would not honor their word that they would pay her.  Upon information and belief, Caron was well-respected jeweler who was the first woman to serve on the board of directors of the Diamond Dealers Club, the most important diamond exchange in the United States.  Upon information and belief, Derek was a gifted physician at Mount Sinai and in private practice.  It was beyond Ms. Wang's imagination that this wealthy, successful couple who appeared to be self-made through hard, honest work would scheme to exploit Ms. Wang and deprive her of remuneration for her hard, honest work.

27.     Thus, even though she was let go from Rafael's Salon and could not make ends meet without borrowing money from her brother and husband, Ms. Wang continued to work for the Enlanders because she was manipulated into believing that the Enlanders would eventually pay her.

28.     For the next three plus years, from December 1999 to January 2003, Ms. Wang catered to the Enlanders' every need, becoming their 24-hour assistant and private masseuse for no pay.  She typically worked at least 18 hours a day, although she often worked more as instructed.  Ms. Wang was required to be on call 24 hours a day to respond to the Enlanders' needs at any time, day or night.  She worked like this from December 1999 through January 2003, without a day off and without any true breaks.

29.     During this period of time, both Derek and Caron instructed Ms. Wang to perform work and supervised her.  Although Ms. Wang kept a small basement apartment in Queens, the Enlanders did not permit her to go home, except to change clothes and eat a quick breakfast in the mornings.  They otherwise forced her to sleep on a couch in their living room or on the floor near the front door.  If Ms. Wang was lucky, she was permitted to sleep in her own apartment three or four times a month, at most.

30.     Ms. Wang continued to assist Caron with all aspects of her jewelry business, including, but not limited to, helping Caron source stones and other materials for her jewelry designs from other vendors in the Diamond District, making deliveries around town to customers and other vendors, picking up Caron's lunch and coffee, distributing advertisements, polishing jewelry, and giving Caron massages at her desk.

31.     Ms. Wang was also responsible for running personal errands for the Enlanders, including, but not limited to, dropping off dry cleaning, delivering gifts to Derek's and Caron's various clients and friends, buying groceries for the couple, taking their shoes to the cobbler for repair, taking Derek's computer in for repair, returning items to various department stores, and attending extension courses on behalf of Caron to record lectures when Caron could not attend.

32.     Ms. Wang also continued to provide hours of spa services to the couple, and oftentimes Caron's visiting mother, including, but not limited to, cutting their nails, washing their feet, and giving them facials and massages.

33.     Ms. Wang performed household chores as well, such as taking out the garbage, cleaning the Enlanders' apartment, washing the dishes, and making sandwiches for the couple. When the Enlanders took Ms. Wang to their home in the Hamptons, she was asked to do yard work and clean their sailboats.

*The Enlanders Coerce Ms. Wang*

34.     Having successfully interfered with Ms. Wang's employment at Rafael's Salon and manipulated Ms. Wang into believing that she would eventually be paid, the Enlanders were able to keep Ms. Wang as a prisoner in their home by creating a climate of fear and intimidation. When Ms. Wang made mistakes or attempted to leave, Caron would unleash a barrage of insults, threatening to kill Ms. Wang, or harm Ms. Wang's family.  Derek often bore witness to Caron's threats and did nothing.  Instead, Derek would shudder during Caron's outbursts, pretending that he himself was too scared of Caron's temper to control her.  All of this was part of a scheme, plan, or pattern intended to defraud Ms. Wang and to cause her to believe that failure to please the Enlanders' whims would result in serious harm.

35.     For example, Caron threatened Ms. Wang's life while she was working in their home at the Hamptons, which had two sinks because the Enlanders kept kosher.  At the time, Ms. Wang did not understand kosher rules and cleaned a cup that Caron had used to drink coffee and milk using the sink that was not supposed to come in contact with dairy products.  Caron became enraged, smashing the cup and screaming, "If you want to die, you can do it again."

36.     Another time, Caron instructed Ms. Wang to buy paper for the bathroom.  With her own money, Ms. Wang purchased a pack of paper towels.  As it turned out, Caron wanted toilet paper.  Although it was a simple misunderstanding, Caron screamed, "F*ck you!  F*cking stupid Chinese girl! Why did you buy that!"

37.     Caron would frequently explode with verbal abuse over any small mistake that she thought Ms. Wang had made, beating her hands on the tables, cursing at Ms. Wang, insulting her by calling her a "stupid Chinese girl" or "stupid sh!t," and screaming that no one else would hire Ms. Wang.

38.     Further compounding Ms. Wang's confusion, Caron often explained away her irrational behavior by suggesting to Ms. Wang that she was giving Ms. Wang indispensable "military training."  Through this "military training," Caron continued to establish and assert her complete control over Ms. Wang's actions.  Caron demanded strict adherence to her rules, such as never being so much as one minute late to a meeting time.  Caron even dictated the temperature of water Ms. Wang was allowed to drink and how Ms. Wang should look, including determining the length of Ms. Wang's hair.

39.     Caron also repeatedly threatened to kill Ms. Wang if she was ever disloyal or left the Enlanders.  In working at Caron Joailliere, Ms. Wang discovered certain questionable sales tactics used by Caron.  Thus, Caron often warned, "This is my business.  Never ever tell anyone about my business.  If you do, I'll kill you."  Caron also warned, "If you leave me and find another job, I'll find you and kill you."  Ms. Wang could tell by Caron's tone of voice that Caron was serious.

40.     Ms. Wang had further reason to believe that Caron was serious about her death threats because Caron regularly carried a gun.  On one occasion Ms. Wang observed Caron's gun sitting on top of a desk that Ms. Wang had been ordered to organize.  On multiple other occasions, Ms. Wang observed the gun sitting inside Caron's handbag.  Ms. Wang was therefore intimidated and feared for her life because she knew Caron had a gun and was quick to anger.

41.     Caron also threatened to stalk Ms. Wang's family when Ms. Wang expressed a desire to return to China to be with them.  She told Ms. Wang words to the effect, "You can't go anywhere.  I'm smart.  I will find you."  When Ms. Wang said that she missed her husband and daughter, Caron would respond by asking how they were doing and then stating, "Your country is dangerous.  You have to be careful."  Caron and Derek would remind Ms. Wang that they

traveled to Asia "often" and had specifically been to China before.  Ms. Wang understood these warnings to be credible threats against the safety of her family, especially given that Caron had explicitly threatened to kill Ms. Wang herself.  Further, Caron had the resources to travel and also knew Ms. Wang's family home address, her home phone number, her husband and daughter's names, and where her husband worked.  Caron had demanded all of this information from Ms. Wang as part of a background check and prerequisite to employment by the Enlanders.

***Caron Sexually Abuses Ms. Wang with Derek's Tacit Help***

42.     From 2000 to 2003, Caron used sexual abuse as part of the Enlanders' scheme, plan, and pattern to control and humiliate Ms. Wang.  Compounding the power and control asserted through sexual abuse, the homosexual nature of these acts was intended to and did inflict an additional layer of severe trauma and emotional distress upon Ms. Wang, particularly because she is from a country where homosexual acts and identities are not widely accepted.

43.     Derek conspired in this scheme, plan, and pattern in order to extract labor and services from Ms. Wang for his own benefit.  He was fully cognizant of the abuse, chose to do nothing, and later used it against Ms. Wang by calling her a "faggot," asking her if she had male genitalia, and accusing her of loving another woman.  At one point, Derek also asked Ms. Wang if the Chinese had a word for "lesbian."

44.     The first incidence of sexual abuse by Caron occurred in January 2000.  Having just showered, Ms. Wang was walking out of the bathroom when Caron ripped off Ms. Wang's towel and said words to the effect of, "let me see what you look like."  Caron then began to touch Ms. Wang's breasts and private parts, whispering to Ms. Wang that she was beautiful.  Ms. Wang was shocked, confused, and humiliated.  She was taken by surprise, afraid of making her volatile boss angry, and unsure what to make of her boss's actions because she had no

experience with or knowledge of same-sex sexual contact.

45.     The Enlanders continued to exploit Ms. Wang's confusion and humiliation as part of their scheme, plan, and pattern to defraud Ms. Wang and to cause her to believe that failure to satisfy their whims would result in serious harm.  After the January 2000 incident, Caron sexually assaulted Ms. Wang on a routine basis.

46.     Indeed, Caron used sexual assault as a way to control and manipulate Ms. Wang. If Ms. Wang satisfied Caron's needs, Caron would be kind, almost tender, toward Ms. Wang. She would dangle carrots in front of Ms. Wang, including promises to help Ms. Wang obtain a green card and buy Ms. Wang an apartment close to her so they could live "like family."  She would claim that Ms. Wang was her lover and that they were business partners at Caron Joailliere.  However, if Ms. Wang attempted to refuse Caron's advances or failed to satisfy Caron, Caron became hostile, threating to call immigration or kill Ms. Wang.

47.     Upon information and belief, Derek was fully aware that his wife had coerced Ms. Wang into performing sexual acts.  He declined to help Ms. Wang in order to further the Enlanders' game of good cop, bad cop.  Many times, when Ms. Wang tried to refuse Caron's advances and leave, Caron suggested that her life was not worth living without Ms. Wang, and threatened suicide.  Indeed, in the winter of 1999, Caron showed Ms. Wang that she had only had one breast as a result of a mastectomy and insinuated that Derek did little to care for her despite the fact that she had cancer.  Caron described Derek as a dangerous and jealous husband, who treated Caron like a dog by depriving her of money and who would harm Caron and Ms. Wang if he ever discovered their sexual relationship.  This further buttressed Caron's claim that she could not pay Ms. Wang until Derek gave his consent.

***The Enlanders Monitor, and Isolate Ms. Wang, Depriving Her of Basic Human Dignity***

48.     In furtherance of their scheme, plan, and pattern to defraud Ms. Wang and to cause her to believe that failure to perform unpaid labor and services would result in serious harm, the Enlanders also monitored and isolated Ms. Wang, depriving her of basic human dignity.

49.     The Enlanders monitored Ms. Wang closely by cell phone, calling her to confirm her whereabouts at all times.  At the outset of the employment relationship in 1999, the Enlanders also demanded that Ms. Wang install a landline in her apartment, requiring that she call from the landline each time she went home.

50.     Further, Ms. Wang had to seek permission from the Enlanders whenever she went anywhere.  Caron, in particular, would interrogate Ms. Wang on where she had been and to whom Ms. Wang had spoken.  If Ms. Wang's answers were unsatisfactory to Caron, Caron would lash out and insult Ms. Wang.

51.     For example, on one occasion, Caron had ordered Ms. Wang to leave the apartment because visitors were coming over.  Ms. Wang was always forced to leave or hide during such occasions.  Thus, on in this instance, Ms. Wang walked to Central Park, where she met a kind man who said he was a professor interested in learning Chinese.  When she returned to the apartment, Caron demanded to know where Ms. Wang had been and whom she had seen. When Ms. Wang told Caron about this man, Caron became enraged.  She said words to the effect of, "Don't talk to strangers, this is New York!  It's very dangerous here!  You f*cking Chinese are so stupid!  If you talk to him again, he's going to rape and kill you!"

52.     The Enlanders purposefully bred distrust and paranoia in Ms. Wang.  Expressing a sentiment similar to Caron's disproportionate reaction to Ms. Wang's encounter with the man

in Central Park, the Enlanders often told Ms. Wang she could not trust anyone, not even the people who were cooking her food in restaurants.

53.     The Enlanders prohibited Ms. Wang from developing local social contacts.  For example, after starting work for the Enlanders, Ms. Wang was prohibited from attending a class where she was learning design and English.  The Enlanders also forced Ms. Wang to hang up the phone when she received calls from her friends.

54.     To further isolate Ms. Wang, the Enlanders made sure that their demands were never-ending.  Although during the entire relevant period of this complaint Ms. Wang rented her own apartment, the Enlanders kept her busy around the clock so that she effectively never lived in her own apartment.  Caron incessantly harassed Ms. Wang by cell phone to make sure that Ms. Wang was always performing one chore or another for the family.  Ms. Wang was forced to work even when she was sick; the Enlanders refused to give her time off.

55.     Ms. Wang was also deprived of basic human dignity.  She was forced to sleep on the couch or the floor at the Enlanders' Fifth Avenue apartment, or on the floor of their Hamptons home.  The Enlanders also withheld food from Ms. Wang.  Over the course of a full day and night of work, Caron would often give Ms. Wang as little to eat as a single fried egg during dinnertime.  If Ms. Wang asked for more food or tried to leave to buy more food for herself, Caron would refuse, stating that Ms. Wang had no right to complain since Derek, a large man, had not even eaten anything yet.  Derek too refused her pleas for food.  One time the couple purchased a huge rotisserie chicken, and Derek forbade Caron from giving Ms. Wang any portion of the chicken.  Trembling with hunger, Ms. Wang drank copious amounts of ice water to feel fuller and to stay alert during the late hours she was forced to work.  This, however, caused Caron to yell at Ms. Wang for visiting the bathroom too frequently.

14

56.     As she was being forced into destitution, Ms. Wang's stress manifested itself physically.  Her skin broke out in hives, and her tooth started to throb, causing swelling in her mouth.  When she told Caron that she was not feeling well, and pointed out that her mouth was swollen, Caron ignored Ms. Wang, withholding medical attention from her.

***The Enlanders Make Lofty Promises to Pay Ms. Wang and Give Her a Green Card***

57.     As part of their scheme, the Enlanders dangled a few carrots before Ms. Wang to deceive her into thinking that things would get better.  Alongside the near-starvation diet, long work hours, and sexual assault, were lofty promises that a "bright future" was awaiting Ms. Wang, one in which she would be compensated, granted a green card, and given a home near Caron.

58.     The Enlanders, however, never intended to fulfill any of these promises.  They made these promises to induce Ms. Wang to continue working for them and to deter her from pursuing any recourse.

59.     One particular instance when the Enlanders deceived Ms. Wang into believing that remuneration was forthcoming occurred in late 2001, after the September 11th terrorist attack.  That attack jolted Ms. Wang and strengthened her resolve to leave the Enlanders and return to her family.  The Enlanders, however, foiled this plan when they called up Ms. Wang's daughter.  They spoke to her directly by phone in front of Ms. Wang, and asked her if she wanted to come to the United States to be with her mother.  They stated to Ms. Wang's daughter that they would help obtain green cards for Ms. Wang and her.  Given that the Enlanders went out of their way to call and make promises to a young child, Ms. Wang relied on their misrepresentations and continued to work for the couple for free.

60.     The Enlanders otherwise liked to remind Ms. Wang of how fortunate she was to work for such a wealthy and successful couple like them.  While walking along Fifth Avenue with Caron, Ms. Wang was reminded by Caron that not many Americans would want to walk alongside a "Chinese person" on such an iconic street.  Derek played into this too.  For example, on an evening when he got an emergency call from Mount Sinai, he forced Ms. Wang to go to the hospital with him, give him massages during the drive to the hospital, and wait in the car for more than an hour while he attended to the patient.

*The Enlanders Con Ms. Wang into Loaning Them Money from 2003 through 2006*

61.     In or around late January 2003, Ms. Wang reached a breaking point.  She was destitute, having been paid only a total of $80 for providing around-the-clock labor and services for more than three years.

62.     Starting on or around January 7, 2003, Caron expanded her private office at Caron Joailliere and had it remodeled.  Ms. Wang was tasked with monitoring the contractors to ensure that their work was accurate and efficient.  After weeks of having her hair covered in sawdust from overseeing the construction project, Ms. Wang took an opportunity to get a haircut during a break without first asking for Caron's approval.  When Caron noticed the difference in the length of Ms. Wang's hair, she became enraged that Ms. Wang had gone out without her permission.  She unleashed a barrage of insults and demanded that Ms. Wang "get out" of the office.  At first, Ms. Wang protested, refusing to leave until Caron paid her for her years of unpaid labor and services.  However, when Caron refused to pay Ms. Wang and threatened instead to call the security guard, Ms. Wang took this opportunity to flee, refusing to go back to the Enlanders' despite calls from Caron later that evening asking her to return.

63.     Shortly thereafter, Ms. Wang consulted a friend about the Enlanders' refusal to pay wages.  On her friend's advice to seek legal help, Ms. Wang contacted an attorney in private practice who drafted a demand letter to the Enlanders for non-payment of wages, which letter was sent to the Enlanders in or around February19, 2003.  The letter threatened suit against the Enlanders unless they provided remuneration for Ms. Wang's labor and services.

64.     When the Enlanders received the demand letter, they immediately deployed a host of tactics to manipulate Ms. Wang to drop her claims.  They bombarded her with threats of deportation, telling her that if she filed suit they would report her to immigration enforcement.  They also harassed her on a daily basis, calling her repeatedly to scream obscenities at her during the day or calling her in the middle of the night to wake her up and then hang up on her.  They even went so far as to schedule a moving company to show up at her door.

65.     Manipulated, confused and frightened to her core by the Enlanders, Ms. Wang decided not to pursue any claims against the Enlanders, and tried to move on with her life.  By March 2003, she obtained a job working in a nail salon, making approximately $3,000 per month.  Because she also feared that the Enlanders could credibly carry out their threat to report her to immigration services, and because she generally still feared that they could track her down and harm her, she also sent them flowers along with approximately $1,500 of cash as a "mea culpa" for even thinking that she could file suit against them.

66.     Having successfully coerced Ms. Wang out of filing suit against them, and leveraging the guilt Ms. Wang felt for even thinking of filing a lawsuit against them, the Enlanders then extorted a portion of Ms. Wang's monthly wages from the nail salon.  Caron asked Ms. Wang to meet her around Fifth Avenue.  She explained that her business was not doing well.  She asked Ms. Wang how much Ms. Wang was making each month at the nail salon and

suggested that Ms. Wang should give a portion of this money each month to help Caron with her business.  Caron then gave Ms. Wang her wedding band as a promise to repay Ms. Wang in the future.  Caron explained that the wedding band was a symbol of their bond, suggesting that it was one stronger than the one Caron had with Derek.  She of course also leveraged the Stockholm syndrome that Ms. Wang developed as a result of being sexually exploited.  Caron told Ms. Wang that she loved her, and made Ms. Wang believe that they were also marital partners – that Ms. Wang had to take care of Caron like a husband taking care of a wife.

67.     Soon thereafter, Caron became increasingly more manipulative, maintaining obsessive e-mail, chat room, and cell phone contact with Ms. Wang on a daily basis.  She sought $500 to $2,000 per month from Ms. Wang as an investment in the jewelry business that Caron falsely presented to her as a "partnership," becoming aggressive towards Ms. Wang if Ms. Wang was delayed in dropping off the money.  Caron would remind Ms. Wang that they had a "contract," insinuating that they were both business and marital partners.

68.     In 2003, Ms. Wang loaned approximately $14,300.00 to the Enlanders.  In 2004, she loaned approximately $9,100.00.  In 2005, she loaned approximately $5,500.00.  In 2006, she loaned approximately $3,000.00.

69.     Derek was fully aware of the Caron's deception, participated in it, and personally benefitted from it.  At times, he would take over Caron's email or chat room account and send demands for money to Ms. Wang.  Indeed, although Caron died in or around May 2006, Derek continued to send Ms. Wang emails and chat room messages through Caron's accounts to demand that Ms. Wang immediately drop off money at the concierge desk.  For example, in early June 2006, Ms. Wang received hostile messages from Caron's email account that accused her of being rich and miserly.  These emails stated, "Why aren't you bringing the money?  It's like a penny to

18

you." Upon information and belief, besides Caron, who was already deceased, Derek was the only person that had access to Caron's email account.

70.     Using emotionally manipulative tactics commonly associated with pimps who confiscate a portion or all of the money a woman earns, the Enlanders psychologically coerced Ms. Wang into giving them a total of approximately $33,400.00 in cash from 2003 through 2006.

*After Caron's Death, Derek Continues the Physical and Psychological Coercion of Ms. Wang*

71.     After Caron's death in May 2006, Derek recruited Ms. Wang to work for him again by exploiting the same tactics of fraud, manipulation, coercion, physical assault, and monitoring. Between 2006 and 2011, Derek continued to sexually and psychologically abuse Ms. Wang, coercing her to provide continued unpaid labor and services. Derek also exploited the psychological bonds created through Caron's relationship with Ms. Wang to keep her in a perpetual state of indentured servitude.

72.     Ms. Wang did not learn of Caron's death until July 2006, when she was dropping off money for that month at the Enlanders' apartment. She was shocked when the concierge informed her that Caron had died two months earlier. Because she continued to receive messages from Caron's email and chat room accounts after Caron's death, including on the day before she spoke to the concierge, Ms. Wang was highly confused about what had actually happened to Caron.

73.     Upon hearing about Caron's death, Ms. Wang immediately called Derek. In or around July 2006, Derek and Ms. Wang met at the Enlanders' apartment, where Derek confirmed that Caron had passed away on or around May 25, 2006. However, he refused to offer any explanation as to the circumstances of Caron's death when Ms. Wang sought clarity on how she could have received messages for money from Caron's online accounts after her death.

74.     Given that Caron was now deceased, Ms. Wang also asked Derek for repayment of the loans she had given to the Enlanders and payment of her wages.  Derek responded by saying words to the effect that he was "thinking about it" and then demand that Ms. Wang "give [him] a massage," insinuating that payment was forthcoming.  Ms. Wang thus knew that unless she continued to serve him, she would never be able to get that money back.

75.     Indeed, on at least one occasion in or around May 2011, Derek expressly stated that he would repay Ms. Wang.  Derek gave Ms. Wang a framed piece of artwork and told her to sell it at a farmer's market near his synagogue.  He told Ms. Wang that the artwork would fetch a large price and that she could keep the money as payment of her wages and repayment on her loans.

76.     Soon after the July 2006 meeting, Derek began calling Ms. Wang incessantly, demanding that she to come over to his apartment to perform services for him, including, but not limited to, giving him massages, manicures, facials, pedicures, and acupuncture and running all of his personal errands.  When Derek fell and injured himself in or around late 2008, he demanded that Ms. Wang provide around-the-clock care for him, including wrapping his swollen leg in hot towels.  Derek monitored where Ms. Wang was at all times, and effectively resumed control of Ms. Wang's working schedule once again by October of 2006.

77.     As part of a scheme of manipulation, fraud, and physical violence to control Ms. Wang and force her to work for him without pay, Derek also routinely assaulted Ms. Wang.  He was fully aware of Caron's sexual abuse of Ms. Wang, and used the same technique of sexual exploitation to create a bond through trauma.  Derek first assaulted Ms. Wang in or around September 2006 by touching her buttocks.  The sexual harassment and abuse escalated to rape in or around April 2007, after which the sexual abuse became routine.

78.     To further the traumatic bonding created through sexual abuse, Derek started using terms of endearment such as "honey," and "my dear."  He told Ms. Wang she must stay in the United States because the two of them were now "family."  To Ms. Wang, Derek referred to Caron's mother as "*our* mother-in-law."

79.     During the period of 2006 through 2011, Derek forced Ms. Wang into impoverishment, increasing his control through fraud, manipulation and coercion.  When Ms. Wang performed part-time work for other employers, Derek demanded that she come to his home to provide services as soon as she was done with work and on all the days she was not working.  There were other times when Derek demanded approximately 12 hours of work per day from her, denying her access to income through even a part-time job.  During this time, Derek also demanded that Ms. Wang pay out-of-pocket for the errands she ran for him, such as buying his shirts, shoes, and undergarments.  She was never paid for any of her labor or reimbursed for her expenses.

80.     During this period, Derek employed gaslighting techniques to separate Ms. Wang from her sense of reality, causing her to believe that she would suffer serious bodily harm if she did not continue to work for Derek.  In the evenings when Ms. Wang went home for the night, he sent electronic messages in the form of hostile, threatening, and disturbing emails and instant messages.  For example, Derek sent messages asking "Do you want to commit suicide?" and calling her a "whore," thereby insinuating that her life was worthless.

81.     Derek also dehumanized and humiliated Ms. Wang.  He would routinely call her "boy" and "faggot," and on at least one occasion, he forced her to show him her vagina when she was menstruating.  He sent her daily emails that contained ads for Viagra and asked "Do you have a penis?"  He was also aware that Caron had given her wedding ring to Ms. Wang,

demanding its return and asking Ms. Wang words to the effect of, "What kind of woman marries another woman?"  These acts exploited the deep sense of shame and emotional distress that Ms. Wang felt from the homosexual nature of the relationship that Caron had imposed on her.  They coerced her into providing more years of unpaid labor and services for fear of being outed as gay.

82.     Derek sent many of these emails through his deceased wife's email account.  Thus he also took advantage of the bond that had been formed between Caron and Ms. Wang to keep her constantly questioning whether Caron was really dead or alive, forcing her to constantly grapple with her own sanity.

83.     Derek manipulated Ms. Wang into believing that she was responsible for Caron's death.  He told Ms. Wang that Caron died earlier than she should have, because Ms. Wang had left the Enlanders' home prematurely.

84.     Like before, Derek made sure Ms. Wang was once again socially isolated.  He monitored her whereabouts, instructed her not to socialize with others, and monopolized all of her time.  For example, during certain periods of time from 2006 through 2011, Ms. Wang had part-time employment with other employers.  Derek, however, ensured that those employment relationships did not last long, because he would call Ms. Wang constantly during shifts for other employers, ask to speak with her, and demand to know when she would be done and could get to his home.

85.     From July 2006 through August 2011, Ms. Wang performed over 2,500 hours of labor and services for Derek for which she was never compensated.  From June 2011 through August 2011, Derek also invited Ms. Wang to work at his private practice, New York ME/CFS Center, to provide massages and acupuncture to his physical therapy patients.  He promised her $125 per session.  Although she provided five sessions to his patients, he only paid her for only

22

three sessions, or $375.

86.     Realizing that Derek was never going to honor his promises, Ms. Wang fled from Derek in August 2011.

## COUNT 1
## INVOLUNTARY SERVITUDE
## THIRTEENTH AMENDMENT AND 18 U.S.C. §§ 1584, 1595

87.     Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

88.     Plaintiff brings a claim for relief under the Thirteenth Amendment of the United States Constitution, and 18 U.S.C. §§ 1584 and 1595, both of which prohibit involuntary servitude.

89.     Defendant knowingly and willfully held Plaintiff in the condition of involuntary servitude, forcing her to work long hours against her will and without payment.

90.     Defendant knowingly and willfully forced Plaintiff to work for him by the use of threats of physical force and by the threat of coercion through the legal process.

91.     Defendant's coercion, abuse, and intimidation caused Plaintiff to reasonably believe that she had no choice but to work for the Enlanders.

92.     Defendant's coercion, abuse, and intimidation caused Plaintiff to reasonably believe that she had no choice but to forfeit her earnings to the Enlanders.

93.     Defendant and his wife Caron directed, assisted, conspired with, and acted in concert with each other to create and enforce a system of involuntary servitude prohibited by the Thirteenth Amendment of the United States Constitution and 18 U.S.C. § 1584.

94.     Defendant knowingly benefitted from this system of involuntary servitude by receiving free labor and services from the Plaintiff.

23

95.     As a direct and proximate result of Defendant's actions, Plaintiff sustained

significant damages, including severe emotional distress and economic losses.  Plaintiff is entitled

to recover damages in an amount to be proven at trial, including punitive damages, attorneys'

fees, and costs.

**COUNT 2**
**FORCED LABOR**
**18 U.S.C. §§ 1589, 1595**

96.     Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth

herein.

97.     Defendant obtained or provided Plaintiff's labor or services in violation of 18

U.S.C. § 1589.

98.     Defendant did so knowingly and willfully through one or more of the following

prohibited means:

> (a) The use of force, threats of force, physical restraint, and threats of physical
>
>    restraint to Plaintiff.
>
> (b) Threats of serious harm to Plaintiff.
>
> (c) Threats of abuse of the law or legal process.
>
> (d) A scheme intended to cause Plaintiff to believe that, if she did not perform such
>
>    labor or services, she would suffer serious harm or physical restraint.

99.     Defendant knowingly benefitted from using the above means to force the Plaintiff

to work by receiving free labor and services from the Plaintiff.

100.    As a direct and proximate result of Defendant's actions, Plaintiff sustained

significant damages, including severe emotional distress and economic losses.  Plaintiff is entitled

to recover damages in an amount to be proven at trial, including punitive damages, attorneys'

fees, and costs.

**COUNT 3**
**TRAFFICKING:**
**<u>18 U.S.C. §§ 1590, 1595</u>**

101.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

102.    As part of a scheme by the Defendant and Caron to obtain Plaintiff's labor and services, Defendant and Caron recruited and trafficked Ms. Wang into their home, and obtained labor, services and a compulsory tithe for the span of twelve years.

103.    Defendant did not compensate Ms. Wang.

104.    Defendant knowingly and willfully committed these acts.

105.    Defendant committed these acts in order to obtain Plaintiff's labor and services in violation of 18 U.S.C. § 1590.

106.    Defendant knowingly benefitted from recruiting, transporting, and harboring the Plaintiff by receiving the Plaintiff's free labor and services.

107.    As a direct and proximate result of Defendant's actions, Plaintiff sustained significant damages, including severe emotional distress and economic losses.  Plaintiff is entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and costs.

**COUNT 4**
**<u>COMMON LAW FRAUD</u>**

108.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

109.    Defendant intentionally made material misrepresentations and material omissions to Plaintiff.  These misrepresentations, that the Enlanders would pay the Plaintiff and help her

25

obtain citizenship status in the United States, among others, were made in order to induce the Plaintiff to keep working for the Enlanders and to loan them money.

110.    Defendant made these material misrepresentations, which he knew to be false, for the purpose of inducing Plaintiff's continued work and loans for his benefit.  Contrary to the promises made, the Defendant had no intention of ever paying the Plaintiff for her labor and services or repaying the loans.

111.    Plaintiff justifiably relied on the Defendant's misrepresentations.

112.    Plaintiff suffered significant injury as a result of Defendant's fraud, including severe emotional distress and economic loss.

113.    Defendant must be made to pay punitive damages in an amount sufficient to punish them and deter others from similar fraudulent and illegal behavior.  Defendant's actions were gross, wanton and willful behavior.

## COUNT 5
## CONSPIRACY TO DEFRAUD

114.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

115.    Defendant conspired with his now deceased wife and non-party, Caron Enlander, to perpetrate fraud on the Plaintiff.  The conspiracy successfully effectuated that fraud, causing Plaintiff to work for the Enlanders or pay them a tithe for twelve years, without receiving any compensation and/or benefits in return.

116.    Defendant personally took steps in furtherance of the conspiracy, including by leading Plaintiff to believe that she would suffer harm at the hands of certain Defendant if she did not continue to provide her services.  Defendant ratified the conspiratorial scheme by taking the benefit of Plaintiff's labor, services, and money.

26

117.    Defendant was motivated to engage in the conspiracy with Caron in order to continue benefiting from the Plaintiff's labor, services, and money.  Defendant and Caron agreed to perpetuate the conspiracy.

118.    Plaintiff suffered significant injury as a result of Defendant's fraud, including severe emotional distress and economic loss.

119.    Defendant must be made to pay punitive damages in an amount sufficient to punish them and deter others from similar fraudulent and illegal behavior.  Defendant's actions were gross, wanton and willful behavior.

<u>COUNT 6</u>
<u>BREACH OF CONTRACT</u>

120.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

121.    Defendant and his wife, non-party Caron Enlander offered Ms. Wang at-will employment in exchange for hourly compensation, $80.00 per hour for her in-home massage services, $125.00 per session for her massage and acupuncture services to Derek's patients, and $8.00 per hour for her assistance at Caron Joailliere.

122.    Defendant and his wife, non-party Caron Enlander also promised to repay Ms. Wang for her monthly loans between 2003 and 2006.

123.    Ms. Wang accepted the Enlanders' offer.  She provided labor and services, and loans.

124.    Defendant reaffirmed his promise to repay Ms. Wang on numerous occasions, the last time being in or around August 2011, but breached the parties' agreement by failing to properly compensate Ms. Wang pursuant to their oral contract.

125.    As a result, Ms. Wang suffered significant damages.  Plaintiff is entitled to

recover damages in an amount to be proven at trial.

## COUNT 7
## QUANTUM MERUIT

126.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

127.    Plaintiff performed labor and services for and loaned money to Defendant in good faith.

128.    Defendant readily accepted Plaintiff's labor, services, and loans, and continued to press for more.

129.    Plaintiff therefore had a reasonable expectation that she would be compensated for her work and repaid for her loans.

130.    As a result, Plaintiff has incurred harm and loss in an amount to be determined at trial.

## COUNT 8
## UNJUST ENRICHMENT

131.    Plaintiff re-alleges and incorporates all prior paragraphs above as if fully set forth herein.

132.    Defendant has been unjustly enriched at Ms. Wang's expense, by receiving the benefit of her labor and services without consistently paying her the correct amount of wages.  He has also been unjustly enriched at Ms. Wang's expense by her loans, which he has failed to repay.

133.    It is against equity and good conscience to permit Defendant to retain the benefits of labor, services, and monies provided to him by Ms. Wang.

134.    As a result, Plaintiff has incurred harm and loss in an amount to be determined at trial.

## JURY DEMAND

135.    Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule

38(b) of the Federal Rules of Civil Procedure.

## RELIEF REQUESTED

**WHEREFORE**, Ms. Wang requests that judgment be entered in her favor and against

Defendant as follows:

a)  compensatory damages according to proof;

b)  unpaid wages, including minimum wages, overtime pay and spread-of-hours pay,
    and liquidated damages, penalties and interest thereon;

c)  treble damages;

d)  punitive damages;

e)  attorneys' fees and costs;

f)  prejudgment and postjudgment interest; and

g)  such other and further relief as this Court deems just and proper.

Dated:   June 29, 2017

Respectfully submitted,

By: /s/ S. Sherry Xia
S. Sherry Xia
HAYNES & BOONE LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Telephone: (212) 918-8961
Facsimile: (212) 884-9561
sherry.xia@haynesboone.com

-and-

Dahsong Kim
ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
Telephone: (212) 966-5932
Fascimile: (212) 966-4303
skim@aaldef.org

*Attorneys for Plaintiff*